## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | |
|---|---|
| **NATIONAL FEDERATION OF THE BLIND**, <br><br> Plaintiff <br> v. <br><br> **DEPARTMENT OF JUSTICE; TODD BLANCHE**, in his official capacity as Acting Attorney General; **DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of the Department of Health and Human Services. <br><br> Defendants. | **Case No. __-cv-_____** |

## COMPLAINT

**INTRODUCTION**

1. On the cusp of the long-anticipated regulatory deadlines for covered entities to ensure that their digital content is accessible to people with disabilities, the Department of Justice ("DOJ") and Department of Health and Human Services ("HHS") issued interim final rules immediately extending those compliance deadlines.[1] The two agencies upended rules that had been years in the making and were carefully crafted to strike the proper balance between ensuring equal access for people with disabilities and feasibility for covered entities. To make matters worse, the agencies left open the possibility of further delays of the compliance deadlines and forecasted an intent to alter the Final Rules' substantive requirements too.

2. For the last two years, if not far longer, state and local government entities and HHS funding recipients have been undertaking efforts to comply with the Final Rules' digital-accessibility standards. People with disabilities, meanwhile, have been eagerly awaiting those changes, which would be transformational to their daily lives. They will no longer struggle to access an array of critical services, programs, and activities hosted on websites and/or mobile applications ("apps"), such as registering to vote, making a vaccine appointment, seeing a doctor through telehealth, enrolling in unemployment benefits, accessing online academic course content, paying a parking ticket, and applying for a professional license or government job.

---

[1] The DOJ interim final rule, *Extension of Compliance Dates for Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*, 91 Fed. Reg. 20902 (Apr. 20, 2026) (the "DOJ IFR"), extended the compliance deadlines contained in an April 24, 2024 final rule issued by DOJ under the Americans with Disabilities Act ("ADA"), *see Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*, 89 Fed. Reg. 31320 (Apr. 24, 2024) (the "DOJ Final Rule"). The HHS interim final rule, *Extension of Compliance Dates for Nondiscrimination on the Basis of Disability; Accessibility of Web Content and Mobile Applications of Recipients of Departmental Financial Assistance*, 91 Fed. Reg. 25501 (May 11, 2026) (the "HHS IFR"), extended the compliance deadlines contained in a May 9, 2024 final rule issued by HHS under Section 504 of the Rehabilitation Act of 1973, *see Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 40066 (May 9, 2024) (the "HHS Final Rule"). The DOJ Final Rule and the HHS Final Rule are collectively referred to as "the Final Rules" and the DOJ IFR and the HHS IFR are collectively referred to as "the IFRs."

3. The compliance deadlines were set for April 24, 2026, and April 26, 2027, in the DOJ Final Rule, and May 11, 2026, and May 10, 2027, in the HHS Final Rule, depending on entity size. But DOJ and HHS extended those deadlines by a year on April 20, 2026, and May 11, 2026, respectively, with no advance notice or opportunity for public comment.

4. In doing so, DOJ and HHS violated the Administrative Procedure Act ("APA"). The IFRs do not comply with notice-and-comment procedures. They are also arbitrary and capricious, as both agencies failed to meaningfully consider the significant harms they pose or reasonable alternatives and offered rationales unsupported by the cited evidence.

5. Plaintiff National Federation of the Blind ("NFB") and its blind members and employees are harmed by the IFRs. They relied on the Final Rules to fix an issue they regularly face: websites and apps that cannot be effectively used due to design barriers that make them inaccessible using access technology, like screen readers. Without relief, Plaintiff, its members, and the broader disability community will continue to face substantial barriers and uncertainty in accessing basic services, programs, and activities and participating equally in society.

**PARTIES**

6. Plaintiff NFB, the oldest and largest national organization of blind persons, is a 501(c)(3) non-profit corporation duly organized under the laws of the District of Columbia and headquartered in Baltimore, Maryland. It has state affiliate organizations in all 50 states, D.C., and Puerto Rico. Many state affiliates also have local chapters.

7. The NFB is a membership organization comprising thousands of blind people, their family members, and individuals who care about issues facing the blind community. The NFB includes special interest divisions that organize blind people around professions (*e.g.*, blind business owners and teachers) and stages of life (*e.g.*, blind students and seniors).

8. The NFB and its affiliates are recognized by the public, Congress, executive agencies, and the courts as a collective and representative voice on behalf of blind Americans and their families.

9. Defendant Todd Blanche is the Acting Attorney General and is named in his official capacity. The Attorney General has rulemaking authority under the Americans with Disabilities Act. *See* 42 U.S.C. § 12134.

10. Defendant DOJ is a cabinet-level department of the federal government headquartered in Washington, D.C.

11. Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and is named in his official capacity. The Secretary of HHS has rulemaking authority under Section 504 of the Rehabilitation Act of 1973. *See* 42 U.S.C. § 794(a); *Cherry v. Mathews*, 419 F. Supp. 922 (D.D.C. 1976).

12.  Defendant HHS is a cabinet-level department of the federal government headquartered in Washington, D.C.

## JURISDICTION AND VENUE

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court has further authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

14. Venue properly lies within the District of Maryland because Plaintiff NFB resides in this judicial district. 28 U.S.C. § 1391(e)(1).

## BACKGROUND

**I.      Section 504 of the Rehabilitation Act of 1973**

15. Congress passed the Rehabilitation Act of 1973 "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society." 29 U.S.C. § 701(b)(1). The statute generally prohibits discrimination against people

3

with disabilities by federal agencies, contractors, and funding recipients. *See id.* §§ 701, *et seq.*

16. Section 504 of the Rehabilitation Act ("Section 504") provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *Id*. § 794(a).

17. Federal agencies that provide funding have rulemaking authority under Section 504. *Id.* HHS's Section 504 regulations cover an array of programs and activities that receive federal financial assistance,[2] including medical providers, child welfare programs, and preschool through adult education programs. *See* 45 C.F.R. §§ 84.56, 84.60, 84.78, 84.79, 84.31, 84.38.

18. As to communications, they require covered entities to "take appropriate steps to ensure that communications with" people "with disabilities are as effective as communications with others," *id*. § 84.77(a)(1). However, federal funding recipients need not "take any action that [they] can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens." *Id.* § 84.22(a)(2). "The decision that compliance would result in such alteration or burdens must be made by the head of the recipient or their designee after considering all" available resources and "be accompanied by a written statement of the reasons for reaching that conclusion." *Id.*

II.     **Title II of the Americans with Disabilities Act**

19. On July 26, 1990, President George H.W. Bush signed the ADA into law. *See* 42 U.S.C.

---

[2] HHS defines "Federal financial assistance" as "any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement by which the Department provides or otherwise makes available assistance in the form of: (1) Funds; (2) Services of Federal personnel; (3) Real and personal property or any interest in or use of such property, including: (i) Transfers or leases of such property for less than fair market value or for reduced consideration; and (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government; any (4) Any other thing of value by way of grant, loan, contract, or cooperative agreement."

4

§§ 12101 *et seq*. The ADA was enacted "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). Its non-discrimination mandate applies broadly to employment, government services, public accommodations, and telecommunications, *id.* §§ 12101 *et seq*.; 47 U.S.C. § 225.

20. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Public entities" include state and local governments as well as "any department, agency, special purpose district, or other instrumentality" thereof. *Id.* § 12131(1). Title II hewed closely to Section 504, adopting the same remedies, procedures, and rights. *Id*. § 12133.

21. Congress directed DOJ to issue regulations under Title II consistent with regulations under Section 504. *Id.* § 12134. DOJ has issued regulations requiring, among other things, that public entities "take appropriate steps to ensure that communications with" people with "disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). However, a public entity need not undertake an action to facilitate communications that "would result in a fundamental alteration . . . or in undue financial and administrative burdens." *Id.* § 35.164. That determination "must be made by the head of the public entity or his or her designee after considering all [available] resources" and "must be accompanied by a written statement of . . . reasons." *Id.*

### III.    The Growing Need for Digital Accessibility

22. Since these statutory enactments, a digital revolution has transformed society. Today, the internet and digital interfaces are used to engage with virtually every aspect of ordinary life.

23. This technological transformation extends to government programs and services. Websites and mobile apps are often critical to government activity in all sorts of ways: applying for or

managing government benefits, engaging in public education, applying for public employment, paying taxes, making service requests, obtaining permits, receiving up-to-date information during emergencies, receiving election information, and more. Analog alternatives, to the extent they even remain available, are increasingly less practical than their digital counterparts.

24. The same is true of health services. Telehealth services, provided via both websites and apps, are widespread. Online forms and web portals are often necessary to manage appointments and health insurance claims, complete paperwork, receive test results, and pay bills. Completing these tasks by phone or in person is often extremely inconvenient or, increasingly, impossible.

25. As digital technology has developed, so has access technology. Many forms of such technology, including screen reader software, refreshable braille displays, optical character recognition systems, and screen magnification, help blind people interact with digital spaces.

26. Screen reader technology is especially crucial for blind people interacting with websites and mobile apps. Screen readers convert the text and features on a digital page to synthesized auditory speech or written braille on a display. On a computer, the user can use key commands to navigate through the page, read text, select clickable options, and perform all the other digital interactions that a sighted person would perform with vision and computer mouse. Similarly, on smartphones, screen reader software converts the content of the screen to audio and allows the user to interact with content via gestures or touches on the screen.

27. The effectiveness of access technology depends on how a website or app is designed. For example, even a simple webpage can be extraordinarily complex. In addition to the primary text at its center, there may be clickable sections at the top header (maybe multiple layers of them, maybe with dropdown menus), a privacy policy disclaimer partially obscuring the content, a search bar in the corner, a homepage button, more sections or clickable options along the side, images

and interactive multimedia, and various clickable links to policies and menus at the bottom.

28. A screen reader essentially converts all those facets of the page into a single linear track, navigable from start to finish. Accessible website design enables effective navigation of that track: Images and visual media carry descriptive text that convey their meaning; content is accurately described and grouped into categories; and "landmarks" are provided, allowing the user to quickly identify and navigate through sections and features with a keyboard instead of a mouse. With proper design, screen reader users can navigate webpages as effectively as sighted people.

29. However, most websites and apps are not properly designed for accessibility. On an inaccessible webpage or app, icons and buttons are often unhelpfully described or not described at all, so the user cannot understand their purpose or use. Images and visual media also often lack descriptions, rendering them meaningless. Field elements on online forms—such as fillable PDF sections, or visual CAPTCHAs that must be completed to access a webpage—may be unlabeled or otherwise impossible to complete. Categories and landmarks may be insufficient or totally absent, meaning a screen reader user must painstakingly navigate bit-by-bit through every piece of content—every menu, every link, every word—on every page they navigate. The user cannot simply select the particular button, feature, or content with which they need to interact. These barriers make navigating a single page of a website or app with screen reader software difficult, and navigating across many pages at a time—as so many tasks require—virtually impossible.

30. Inaccessibly designed webpages and apps can render the internet unusable for the blind.

31. To combat these barriers and ensure the internet is accessible to all, industry standards developed to facilitate accessible website and app design. Since the early-1990s, the World Wide Web Consortium's Web Accessibility Initiative has developed publicly available standards for accessibly designed webpages: the Web Content Accessibility Guidelines ("WCAG").

32. The first official set of guidelines, WCAG 1.0, were issued in 1999. As internet technology developed, WCAG issued more technically specific and advanced guidelines in 2008 (WCAG 2.0), 2018 (WCAG 2.1), and 2023 (WCAG 2.2), along with corresponding testing and evaluation standards to facilitate their widespread implementation.

33. The WCAG standards are the internationally recognized consensus standard for internet accessibility. Multiple countries, as well as the European Union, have required compliance with WCAG standards for public web content. *See, e.g.*, 89 Fed. Reg. at 40131 nn.147-48. Some states also use WCAG standards. *Id.*

## IV.     DOJ's Rulemaking Under the ADA

### A.  Development of the 2024 DOJ Final Rule

34. DOJ first made clear nearly thirty years ago that public entities covered by Title II of the ADA must make their internet-based communications accessible. *See* Letter from Deval L. Patrick, Assistant Att'y Gen., DOJ, to Hon. Tom Harkin, U.S. Senator (Sept. 9, 1996), https://perma.cc/2ZPB-U7BL.

35. Since then, federal courts and DOJ have repeatedly recognized that inaccessible government websites and apps can violate the ADA. *See, e.g.*, 89 Fed. Reg. 31329 n.81; 28 C.F.R. pt. 35, App. A ("The Department has consistently interpreted the ADA to cover websites that are operated by public entities and stated that such sites must provide their services in an accessible manner or provide an accessible alternative to the website that is available 24 hours a day, seven days a week."). However, DOJ initially did not specify the standard for digital accessibility.

36. Beginning over 15 years ago, DOJ undertook regulatory action to implement comprehensive web and mobile app accessibility standards for state and local government entities under Title II. After an extended, deliberate process—rulemakings, cost-benefit analyses, expert

input and public comment—those efforts culminated in promulgation of the DOJ Final Rule.

37. In 2010, DOJ published an advanced notice of proposed rulemaking entitled *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations*. 75 Fed. Reg. 43460 (July 26, 2010) ("2010 ANPRM"). The 2010 ANPRM announced that DOJ was considering revising its Title II regulations to establish specific requirements for public entities' website accessibility. *Id.*

38. In doing so, DOJ observed that the internet as it is known today did not exist when the ADA was enacted in 1990, but since then—even in 2010—had grown critical to everyday life. *Id.* at 43461. Yet, it explained, the inaccessibility of many websites put people with disabilities at a great disadvantage in society. *Id.* DOJ summarized how inaccessible websites and digital content could adversely affect people with disabilities, especially blind people. *Id.* at 43461-63.

39. As to Title II, DOJ emphasized its concerns about the accessibility of digital information in public education and in government programs and benefits. *Id.* at 43461-62. Based on the ADA's expansive nondiscrimination language and remedial intent, DOJ interpreted the ADA to require web accessibility and invited public comment on a rule implementing that requirement. *Id.* at 43463-65. That included soliciting comments on the costs of making websites accessible, whether there were reasonable alternatives that DOJ should consider, and when any web accessibility requirements should take effect. *Id.* at 43465-67.

40. The 2010 ANPRM prompted hundreds of public comments and put the public on notice of potential compliance obligations in this area.

41. Over the next 14 years, DOJ engaged in a painstaking, deliberate regulatory process to consider the impact of web accessibility rules on all stakeholders: public entities and their systems and institutions; private industry; advocacy organizations; people with disabilities and their

families, and more.

42. In 2016, DOJ issued a detailed supplemental advance notice, citing developments in technology and relevant standards and soliciting more specific public input, including regarding the use of websites by smaller public entities, potential burdens of compliance with a web-accessibility rule, and how to measure those burdens. *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*, 81 Fed. Reg. 28658, 28,685-86 (May 9, 2016). DOJ received hundreds of public comments in response.

43. After rulemaking in this area stalled under the first Trump Administration, DOJ reengaged in 2023, publishing a notice of proposed rulemaking. *See Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities,* 88 Fed. Reg. 51948 (Aug. 4, 2023) ("DOJ NPRM"). The lengthy DOJ NPRM set forth DOJ's specific proposal for a web-accessibility rule, which included adopting the WCAG 2.1 Level AA criteria and a compliance deadline of two years after the publication of the final rule for public entities with a total population of 50,000 or more, and three years for public entities with a total population of less than 50,000 and for special district governments. *Id.* at 51949.

44. The DOJ NPRM also included a detailed Preliminary Regulatory Impact Analysis, discussing and estimating the costs of compliance for state and local entities and the benefits for people with disabilities and the public. *See id.* at 51986-52018.

45. The DOJ NPRM included 67 questions for public input and a fact sheet describing the proposed requirements. *Id.* at 51958-86; U.S. Dep't of Just., *Fact Sheet: Notice of Proposed Rulemaking on Accessibility of Web Information and Services of State and Local Government Entities*, ADA.gov, https://perma.cc/B7JL-9CVS (last visited May 21, 2026). The questions sought input regarding what technical standards to adopt, how to measure compliance, compliance costs

10

and challenges for public entities, how public entities use technology to communicate and barriers people face in accessing those communications, how the proposed compliance dates would affect small entities and whether they face budget constraints, how the proposed compliance date would affect people with disabilities, and whether a different compliance date should apply for certain digital content. 88 Fed. Reg. at 52958-86.

46. During the 60-day comment period, DOJ received hundreds of comments from a diverse group of stakeholders, including public entities, people with disabilities, advocacy organizations, the accessible technology industry, and web developers. 89 Fed. Reg. at 31325. DOJ also held three "listening sessions" hosted by the U.S. Small Business Administration ("SBA") Office of Advocacy and organizations representing higher education and the disability community. *Id.*

### B.  The 2024 DOJ Final Rule

47. DOJ published its Final Rule under Title II on April 24, 2024. *See* 89 Fed. Reg. 31320.

48. As it recognized in past publications and as reinforced by public comments, DOJ determined in the DOJ Final Rule that public entities increasingly provide critical government services via websites and mobile apps. *Id.* at 31325-26. It cited many examples, particularly in the wake of the COVID-19 pandemic: managing requests for public services; accepting public reports and complaints; administering occupational licensing, permit requests, vehicle registrations, space reservations, activity sign-ups, and money collection; managing public benefits programs; providing access to civic processes and public records; providing notices and public information; providing public education; and more. *Id.*

49. The DOJ Final Rule further explained that those digital spaces are often not designed accessibly, which denies people with disabilities equal access to important services, programs, and activities. *Id.* at 31326. For example, the DOJ Final Rule cited a March 2021 study, finding that

11

many mobile apps are "highly inaccessible," including for screen reader users. *Id.* at 31327 nn.63-65 (citing *Large-Scale Analysis Finds Many Mobile Apps Are Inaccessible*, Univ. of Wash., CREATE (Mar. 1, 2021), https://perma.cc/442K-SBCG). The DOJ Final Rule determined that analog alternatives are no longer adequate substitutes for effective digital access, given their increased difficulty, inconvenience, and wait times. *Id.* at 31384.

50. Given that the ADA's equally-effective-communication requirement and non-mandatory technical standards had failed to result in widespread equal digital access for people with disabilities, the DOJ Final Rule determined that specific requirements were necessary to ensure compliance, clarity, and predictability around legal obligations. *Id.* at 31355. Therefore, it created a new regulatory subsection setting forth technical requirements for ensuring public entities' web content and mobile apps are accessible for people with disabilities.

51. The DOJ Final Rule adopts the internationally recognized June 2018 WCAG 2.1 standard as the mandatory technical standard for digital accessibility. *Id.* at 31321. Specifically, public entities must achieve conformance with "Level AA success criteria"—a measurable standard for conformance with WCAG 2.1—and follow the corresponding conformance requirements. *Id.*

52. As the DOJ Final Rule explains, "[i]n many instances, removing certain web content and mobile app accessibility barriers is neither difficult nor especially costly." *Id.* at 31328. Nevertheless, in express recognition of the burdens of reaching compliance, especially for small public entities, DOJ imposed a staggered compliance timeline. *Id.* Public entities with a total population of 50,000 or more were required to achieve compliance within two years of the DOJ Final Rule's publication, while smaller entities with total populations below 50,000 and special district governments were required to achieve compliance within three years. *Id.*

53. The DOJ Final Rule's Final Regulatory Impact Analysis ("2024 DOJ FRIA") found that

the economic benefits to society of the Final Rule outweigh its costs by about $1.5 to $1.9 billion annually (without even factoring in qualitative benefits). *Id.* at 31330. On average, estimated costs to covered public entities to reach compliance would constitute less than one percent of revenues, including for small public entities. *Id.* at 31311-33.

54. As the DOJ Final Rule's discussion demonstrates, DOJ thoroughly considered and balanced the input and interests of public entities subject to the rule and the disability community. For example, in public comments, many advocates urged DOJ to require adoption of WCAG 2.2 rather than 2.1. *Id.* at 31347. WCAG 2.2 includes several additional "success criteria" and additional guidance to improve accessibility for people with certain cognitive disabilities. *Id.* DOJ, however, declined to require compliance with WCAG 2.2 because WCAG 2.1 offered the best balance for public entities, web developers, and other industry stakeholders. *Id.* at 31348.

55. DOJ also considered comments expressing a range of views about how long public entities should be given to achieve compliance. *Id.* at 31351. Ultimately, the DOJ Final Rule maintained the compliance deadlines proposed in the DOJ NPRM, because "[a]fter carefully weighing the arguments," DOJ determined that "[s]hortening the compliance dates would likely result in increased costs and practical difficulties for public entities, especially small public entities," while "[l]engthening the compliance dates would prolong the exclusion of many individuals with disabilities from public entities' web content and mobile apps." *Id.*

56. The DOJ Final Rule contains still other examples of DOJ's thoughtful efforts to balance competing concerns. It retained exceptions from compliance for individualized password-protected electronic documents and for pre-existing conventional electronic documents over the objections of disability groups. *Id.* at 31379-80. And it added an exception for preexisting social media posts based on the input of public entities. *Id.* at 31381.

13

V.    **HHS's Rulemaking Under the Rehabilitation Act**

A.  **Development of the 2024 HHS Final Rule**

57. Like DOJ, HHS has undertaken regulatory action over years to implement web and mobile app accessibility standards for recipients of federal financial assistance covered by Section 504.

58. As early as 2016, HHS forecasted the need for clear digital information standards in health services. In regulations under the Affordable Care Act—which prohibit discrimination on, *inter alia*, the same grounds as Section 504 for health programs and activities receiving federal financial assistance, 45 C.F.R. §§ 92.1(a), 92.2(a)—HHS stated that "it is difficult to ensure compliance with accessibility requirements without adherence to standards such as the WCAG 2.0 AA standards" (the most current WCAG at the time). *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31375, 31426 (May 18, 2016). HHS "strongly encourage[d]" covered entities to implement such standards voluntarily. *Id.*

59. In September 2023, HHS issued a proposed rule entitled *Discrimination on the Basis of Disability in Health and Human Service Programs or Activities*. 88 Fed. Reg. 63392 (Sept. 14, 2023) ("HHS NPRM"). The proposed rule emphasized the historic exclusion of people with disabilities from health programs and activities and found that "[w]eb content and mobile applications provide increasingly crucial gateways to health and human service programs and activities," such that "[i]naccessible technology can cause severe harm," like "denials of cancer screenings." *Id.* at 63394, 63418.

60. HHS pointed out that Section 504 already required web and mobile app content to be accessible, but it found that covered entities lacked "specific direction on how to comply." *Id.* at 63418; *see also, e.g.*, *id.* at 63423 n.248 (collecting federal cases finding websites covered by Section 504). HHS found that the compliance efforts it "strongly encouraged" in 2016 and

14

subsequent enforcement actions undertaken by multiple federal agencies had been insufficient to remediate widespread accessibility barriers online. *Id.* at 63418, 63423-24. Thus, the proposed rule announced that HHS was considering implementation of comprehensive standards to achieve "web, mobile, and kiosk[3] accessibility," *id.* at 63393.

61. Specifically, HHS proposed adoption of WCAG 2.1 Level AA based on essentially the same rationales as DOJ proposed for Title II compliance, which would provide a unified framework for web accessibility under the ADA and Section 504. *See id.* at 63419-28. Likewise, HHS proposed the same compliance timeline as the DOJ Final Rule: two years for recipients with 15 or more employees, and three years for recipients with fewer than 15 employees. *Id.* at 63509.

62. In addition to providing a detailed explanation for its proposed selection of WCAG 2.1 Level AA and compliance timelines, *id.* at 63425-30, HHS solicited public input on 61 questions, *id.* at 63424-49. These included topics such as: whether a different compliance standard would be appropriate for smaller recipients; compliance costs and challenges, including for smaller recipients and educational institutions; how recipients manage their content and use third-party content; information about the impacts on people with disabilities; the feasibility of proposed exceptions; and how to assess compliance. *Id.* at 63428, 63432, 63435, 63439, 63441.

63. HHS also conducted a regulatory impact analysis and an analysis of impact on small entities in particular, assessing both the costs of compliance and the benefits to people with disabilities. *See id.* at 63491-93.

64. The proposed rule generated thousands of public comments, which HHS thoroughly considered and incorporated into its subsequent final rulemaking.

---

[3] The proposed rule defined kiosks as "self-service transaction machines made available by recipients at set physical locations for the independent use of patients or program participants in health or human service programs or activities," such as machines used to check-in for medical appointments. *Id.* at 63,466.

15

**B.  The 2024 HHS Final Rule**

65. On May 9, 2024, HHS published its Final Rule. *See* 89 Fed. Reg. 40066.

66. The HHS Final Rule generally adopted the structure and subparts of the HHS NPRM, with some changes based on public comments. *See id.* at 40170-74. The HHS Final Rule "mirror[s] the corresponding provisions in the [DOJ Final Rule]," "fulfill[ing] Congress's intent that title II of the ADA and section 504 be interpreted consistently." *Id.* at 40066. Therefore, the HHS Final Rule adopted WCAG 2.1 as the web accessibility standard under Section 504, with compliance required within two years for larger entities and three years for smaller entities. *Id.* at 40130.

67. In response to public comments, HHS emphasized steps taken to "reduce burdens on small recipients," including the longer compliance timeline and exceptions beyond just the undue burden and fundamental alteration defenses. *Id.* at 40129-30. The HHS Final Rule struck many of the same compromises as the DOJ Final Rule, rejecting more stringent options advocated by disability groups and incorporating new exceptions. *See, e.g.*, *id.* at 40130-32 (declining to adopt stricter compliance standards, including WCAG 2.2 or evolving standards); *id.* at 40134-35 (adopting new exception for preexisting social media content). As to the compliance deadlines, HHS explained that "[a]fter carefully weighing the arguments that the compliance dates should be kept the same, shortened, or lengthened, the Department has decided that the compliance dates in the final rule . . . strike the appropriate balance between the various interests at stake," including "costs and practical difficulties for recipients" and mitigating "the exclusion of many people with disabilities from recipients' web content and mobile apps." *Id.* at 40133.

68. The HHS Final Rule also includes a discussion of the costs and benefits, a final regulatory impact analysis, and a small entity analysis. *Id.* at 40174-77; *see* HHS, Regulatory Impact Analysis 2 (2024)  https://perma.cc/X9ML-KN3E ("HHS FRIA"). The HHS FRIA discussed its

16

consideration of comments, including "comments concerning the costs and challenges that small recipients would face," like budget constraints. HHS FRIA at 2-3. Ultimately, it explained that "the final rule strikes the appropriate balance by requiring small recipients to comply with the same technical standard as larger recipients while giving small recipients additional time to do so," and by providing exceptions and defenses. *Id.* at 3.

69. The DOJ and HHS Final Rules were landmark regulatory actions to bring disability rights into the internet age. Mandating accessible web and mobile content would be lifechanging for many blind people who rely on government, health, and social services in their daily lives. The disability rights and blind advocacy communities eagerly awaited the two- and three-year compliance deadlines to finally experience equal access to public digital information.

## VI. The Interim Final Rules

### A. The 2026 DOJ Interim Final Rule

70. On April 20, 2026—just four days before larger entities were required to comply with the DOJ Final Rule—DOJ issued the DOJ IFR extending the compliance deadlines. *See* 91 Fed. Reg. 20902. Specifically, "[t]he compliance date for [s]tate and local government entities with a total population of 50,000 or more is extended from April 24, 2026, to April 26, 2027," and "[t]he compliance date for public entities with a total population of less than 50,000, or any special district government, is extended from April 26, 2027, to April 26, 2028." *Id.* DOJ also noted that "further delays of this deadline" might occur and that it "plans to engage in future rulemaking processes related to the substantive requirements of the [DOJ] Final Rule." *Id.* at 20908.

71. The DOJ IFR was issued "without prior public notice and comment . . . and without a delayed effective date." *Id.* Instead, it provides for a "post-promulgation 60-day public comment period," *id.* at 20909, but took immediate effect on April 20, 2026.

i.    *DOJ Unlawfully Bypasses Public Comment*

72. In the DOJ IFR, DOJ claims that it did "not have time to go through notice-and-comment rulemaking," *id.*, because "[i]n the months leading up to the April 24, 2026, compliance date . . . the Department identified new information about the [DOJ] [F]inal [R]ule's compliance time frames," and "the only way for the Department to delay the consequences of this rule is to forgo prepublication notice and comment," *id.* at 20905, 20909. The DOJ IFR asserts that DOJ was "made aware" of "[c]ircumstances beyond the Department's control . . . through correspondence to the Department and to the Office of Management and Budget ("OMB") as well as through the Department's own observations of covered entities' compliance capabilities, [which] prompted the Department to extend the compliance deadlines." *Id.* at 20905.

73. In fact, the information cited in the DOJ IFR is not new and raises the same considerations weighed by DOJ during the original rulemaking. That information was also available to DOJ sufficiently in advance of April 24, 2026 to have allowed for pre-publication notice and comment. It includes the following:

74. **OMB Letters.** The DOJ IFR asserts that "[t]he Department was made aware of challenges related to the compliance dates in correspondence to the OMB[.]" *Id.* at 20905. On April 11, 2025, OMB issued a Notice of Request for Information, which "solicit[ed] ideas for deregulation" by broadly asking the public to "identify rules to be rescinded." *Request for Information: Deregulation*, 90 Fed. Reg. 15481 (Apr. 11, 2025). *See* 91 Fed. Reg. at 20905. The DOJ IFR relies on two letters submitted in response to that OMB solicitation, each of which recommends a host of federal regulations for recission.

75. First, DOJ cites a May 12, 2025 letter submitted by a group of higher education industry associations stating that for higher-education entities, compliance with the DOJ Final Rule and a

18

separate Department of Education rule "will entail significant commitments of resources and staff time." Letter from Ted Mitchell, President, Am. Council on Educ., to Russell T. Vought, Director, OMB (May 12, 2025), https://perma.cc/2WCF-TP4V (discussed at 91 Fed. Reg. at 20905) ("Associations Letter"). Nowhere, however, does that letter claim that educational institutions will be unable to meet the DOJ Final Rule's compliance deadlines. *Contra id.* ("Our institutions are preparing to comply with these reporting and implementation deadlines[.]"). The burdens it discusses are no different from those already raised in a comment letter submitted by many of the same signatories in response to the DOJ NPRM. *See* Letter from Ted Mitchell, President, Am. Council on Educ., to Rebecca B. Bond, Chief, Disability Rts. Section, DOJ (Oct. 3, 2023), https://perma.cc/LD2Z-CBW2.

76. Second, DOJ cites a letter from the SBA Office of Advocacy, which—in a brief paragraph dedicated to the DOJ Final Rule, among many others identifying other targets for deregulation— claims that "the Department underestimated the costs and burden of the DOJ Final Rule for small public entities." 90 Fed. Reg. at 20905 (citing Letter from Chip Bishop, Deputy Chief Couns., SBA Off. of Advoc., to Russell T. Vought, Director, OMB, at 10-11 (May 12, 2025), https://perma.cc/ F984-X9L3). The sole authority that the SBA letter provides for that assertion is a citation to its own prior comment letter submitted in connection with the DOJ NPRM. SBA Advocacy Letter at 10 n.41; *see* 91 Fed. Reg. at 20905.

77. Both letters are dated nearly a year before the DOJ IFR was issued and are publicly available on Regulations.gov.[4]

78. **Information Received by DOJ.** The DOJ IFR references information DOJ received directly. 91 Fed. Reg. at 20905. It discusses a purported statement by a single unidentified

---

[4] The OMB solicitation also prompted multiple letters expressing strong support for the DOJ Final Rule and the critical protections it provides to people with disabilities. *See* 91 Fed. Reg. at 20905-06.

Congressman expressing his views regarding "the complexity of remediating STEM (science, technology, engineering, and mathematics) content," and a purported request from education industry associations to "either delay the compliance dates or rethink the level of compliance required" due to the burdens they impose. *Id.* The DOJ IFR does not identify these speakers or the date of their communications. *See id.* The concerns they purportedly shared, such as financial costs and litigation risks, *id.*, were considered in the DOJ Final Rule. *See, e.g.*, 89 Fed. Reg. at 31330-36 (costs); *id.* at 31386, 31389 (litigation risks); *id.* at 31373 (STEM materials).

79. **DOJ's Observations.** The DOJ IFR cites DOJ's "own review" in determining that the DOJ Final Rule "overestimated the capabilities (whether staffing or technology) of covered entities to comply with the rule in the time frames provided." 91 Fed. Reg. at 20906. The DOJ IFR offers no information about the "reported resource constraints" that purportedly necessitated extending the deadlines, *id.* at 20909. DOJ also asserts, without further explanation, its "belief that it overestimated the advancement and availability of technology to make web content and mobile apps accessible when it set the original compliance dates." *Id.* In fact, the DOJ Final Rule did not rely on the anticipated existence of any specific technological innovation as the basis for entities' ability to meet the compliance deadlines. Rather, as DOJ acknowledges, the DOJ Final Rule generally recognized the obvious fact that "there is now more available technology to make web content and mobile apps accessible" than "over a decade" ago, when DOJ "first published the ANPRM in 2010" and "started receiving . . . feedback" on potential compliance timelines. 91 Fed. Reg. at 29904-05 (citing 89 Fed. Reg. at 31353).

ii.     <u>*DOJ Arbitrarily and Capriciously Delays Implementation of the DOJ Final Rule*</u>

80. Broader assertions in the DOJ IFR and the irrational reasoning underlying them betray that, in fact, the DOJ IFR was not supported by good cause. Rather, it attempts to functionally

repeal a policy consistent with the Trump Administration's deregulatory agenda without the burden of a full rulemaking. Indeed, in addition to heavily relying on responses to the OMB solicitation, the DOJ IFR identifies itself as a "deregulatory action" under Executive Order 14,192, which requires that "any new incremental costs associated with new regulations . . . be offset by the elimination of existing costs associated with at least 10 prior regulations." Exec. Order No. 14,192 § 3(C), *Unleashing Prosperity Through Deregulation*, 90 Fed. Reg. 9065 (Jan. 31, 2025).

81. For example, DOJ takes issue with the DOJ Final Rule's adoption of the internationally recognized WCAG 2.1 standard. It claims that the DOJ Final Rule failed to provide "fair notice" because it "links to dynamically changeable websites for compliance standards for WCAG 2.1," and "standards may change at any time without notice." 91 Fed. Reg. at 20906. Yet the DOJ Final Rule is explicit that it requires conformance with the *June 2018* version of the WCAG 2.1 Level AA, that "new versions of WCAG . . . will not be automatically incorporated into this rule," and provides a permalink to the exact version that governs. 89 Fed. Reg. at 31336, 31343 & n.13.

82. The DOJ IFR further states that covered entities frequently use generative artificial intelligence ("AI"), and thus they may not be able to comply with the DOJ Final Rule because AI creates content that is "potentially inaccessible." 91 Fed. Reg. at 20907. For this claim DOJ cites a New York City Bar article, which recognizes that AI outputs are not accessible when the *initial inputs* "fail[] to meet even the most basic WCAG compliance levels" and thus recommends— consistent with the DOJ Final Rule—that inputs "align[] more closely with accessibility standards," including WCAG standards. N.Y.C. Bar, *The Impact of the Use of AI on People with Disabilities* 6-7 (2025), https://perma.cc/ W87A-K26K (cited in 91 Fed. Reg. at 20907 n.62). DOJ also relies on a Northeastern University webpage stating that AI does not provide alternative ("alt") text describing the images it generates, which makes them largely inaccessible to those using

screen reader technology. 91 Fed. Reg. at 20907 n.62 (citing Ne. Univ., *AI and Accessibility*, https://perma.cc/ M9B4-2TPN). This purported justification only highlights why the DOJ Final Rule is necessary to ensure accessibility. As it recognizes, adding alt text "is neither difficult nor especially costly" and can be added "without any specialized equipment," to allow "an individual using a screen reader . . . to gain access to the information on the website." 89 Fed. Reg. at 31328. That many covered entities choose to rely on tools that produce inaccessible content does not justify delaying compliance; it shows that compliance standards are needed.

83. DOJ also claims that extending the compliance date "could" mitigate confusion, because the DOJ Final Rule did not adopt an exception from its accessibility requirements for password-protected educational content, as proposed in the DOJ NPRM. 91 Fed. Reg. at 20908; *see* 89 Fed. Reg. at 31360. And, according to the DOJ IFR, entities could comment on the removal of that exception during the post-publication comment period. 91 Fed. Reg. at 20908. Yet, nowhere does the DOJ IFR claim that the removal has caused confusion, and it was already the subject and result of public comment and reasoned consideration by DOJ, *see* 89 Fed. Reg. at 31360-61.

84. DOJ emphasizes that, absent relief, covered entities could face litigation for non-compliance with the DOJ Final Rule due to the ADA's inclusion of a private right of action. 91 Fed. Reg. at 20906. While the DOJ IFR recognizes that ADA-covered entities are not required to undertake compliance that "would result in a fundamental alteration to their services, programs, or activities or undue financial and administrative burdens," *id.*, it claims that the extended deadlines allow covered entities to "avoid spending time and resources assessing the application of these defenses" and "instead specifically focus on compliance efforts." *Id.* at 20907. This, it posits, "will ultimately lead to greater accessibility for individuals with disabilities because more time and resources will be devoted directly to compliance." *Id.*

85. This logic collapses on itself several times over. A covered entity would need to determine *before* undertaking compliance efforts whether an undue burden or other defense exempts them from having to comply. It is also unclear how a delayed compliance date would ameliorate the DOJ IFR's concern that entities facing undue burdens would be subject to litigation, because that risk will still exist when the DOJ Final Rule does take effect. *Id.* at 20907. To the extent DOJ claims litigation risk based on "international actors [who] may attempt to access websites and file litigation to enforce the [DOJ Final Rule]," this assertion is entirely hypothetical, is not cured by a delayed effective date, and is undermined by the DOJ IFR's own recognition that a plaintiff would still need "some connection with the public entity" for standing. 91 Fed. Reg. at 20906 n.59. And all of this information was available to DOJ when it promulgated the DOJ Final Rule.

86. DOJ's assessment of the cost and benefits of its extension is also deeply flawed. The DOJ IFR fails to provide *any* cost and benefit analysis of extending the Final Rule and relies instead on the 2024 DOJ FRIA's assessment of an alternative compliance timeline of four years for smaller public entities and three years for larger ones. *Id.* at 20909. As an initial matter, DOJ's decision to both disclaim the accuracy of the 2024 DOJ FRIA's estimates of compliance costs, *see id.*, and to simultaneously rely on it to assess costs of the DOJ IFR is internally inconsistent. And there is strong reason to believe that the 2024 DOJ FRIA's assessment of longer compliance deadlines would not accurately capture the costs and benefits of the DOJ IFR; the 2024 DOJ FRIA did not account for this scenario, namely that compliance efforts and costs would likely be expended by now given the original deadlines.

87. Similarly, the DOJ IFR's conclusion that its delayed effective dates would promote cost savings relies on a facially inaccurate assumption. It assumes that the delay "[p]ush[es] the large first-year implementation cost into the future," and that there are thus *zero* costs for year 1. *Id.* at

20910 & T.1. Again, that wholly fails to account for the fact that many public entities have already undertaken significant implementation efforts based on the anticipated DOJ Final Rule's compliance deadlines. DOJ's reliance on inaccurate economic assessments further undermines its determination that the DOJ IFR mitigates burdens on public entities that allegedly make compliance with the DOJ Final Rule's deadlines infeasible.

88. More fundamentally, DOJ gives astonishingly short shrift to the harms for people with disabilities. While the DOJ IFR acknowledges that letters were submitted in response to OMB's solicitation in support of the DOJ Final Rule, *id*. at 20905-06, it dismissively claims that the DOJ IFR will "provide more certainty and predictability" and "benefit persons with disabilities and disability advocacy organizations because . . . it replaces the potential for wasted time and money in litigation with the opportunity for covered entities' to achieve actual compliance with the rule," *id.* at 20908.

89. As the NFB's June 9, 2025 letter in response to the OMB solicitation describes, far from creating uncertainty, the DOJ Final Rule provides long-sought clarity regarding government entities' ADA obligations by adopting a consensus standard for web and mobile app accessibility. *See* Letter from Mark A. Riccobono, President, NFB, to Russell T. Vought, Director, OMB (June 9, 2025), https://perma.cc/9NVL-FHL6 (cited in 91 Fed. Reg. at 20906 n.53). It is the DOJ IFR that creates uncertainty and unpredictability by delaying the DOJ Final Rule's deadlines at the one-yard line, after covered entities and people with disabilities prepared for its imminent effect.

90. As described further *infra* § VII, the impacts of the DOJ IFR for people with disabilities are severe. DOJ downplays them, suggesting that "the one-year extension will mean that an individual with a disability may need to request accessible versions of certain electronic documents from a public entity and wait for those requests to be fulfilled." 91 Fed. Reg. at 20908.

But as the DOJ Final Rule explains in detail, undertaking such a request is not trivial. A person with a disability "might have to call to request assistance with filling out either online or mailed forms, which could involve significant delay, added costs, and could require providing private information such as banking details or Social Security numbers over the phone without the benefit of certain security features available for online transactions." 89 Fed. Reg. at 31384. Such analog alternatives are not always available, are often not equally effective, and are not workable for everyone, such as those who are deafblind or those needing public safety resources who lack a safe, private location to seek help by phone. *Id.*

91. As another letter sent to OMB explains, without the DOJ Final Rule, students are excluded from full participation in their education, impacting their ability to register for classes, access video lectures, and ultimately to graduate and obtain gainful employment. Letter from Stephen G. Smith, Chief Exec. Officer, Ass'n on Higher Educ. and Disability, to Russell T. Vought, Director, OMB, at 1 (July 26, 2025), https://perma.cc/PJ6A-XDBE (cited in 91 Fed. Reg. at 20905 n.50); *see also* 89 Fed. Reg. at 31326 ("Most public colleges and universities rely heavily on websites and other online technologies in the application process for prospective students; for housing eligibility and on-campus living assignments; for course registration and assignments; and for a wide variety of administrative and logistical functions in which students must participate."). Those with children in public school face challenges communicating with teachers and administrators, who often use web-based platforms to correspond with parents. *See id.* DOJ failed to address these harms.

92. DOJ also failed to consider other implications of delaying the effective date. For example, but for the DOJ IFR, the compliance deadline for large government entities would be in effect during the 2026 mid-term elections. As a result of the DOJ IFR, people with disabilities will face greater obstacles accessing public websites for purposes of voter registration, obtaining candidate

information, or locating information about how to run for office themselves. *See id*. The DOJ IFR also does not address the repercussions for those seeking public assistance benefits, such as unemployment or food stamps, which are available through state websites, *see id.*

### B. The 2026 HHS Interim Final Rule

93. On May 11, 2026—the same day that larger recipients of federal financial assistance were required to comply with the HHS Final Rule—HHS issued the HHS IFR extending the compliance deadlines contained in the HHS Final Rule. *See* 91 Fed. Reg. 25496. Specifically, "the compliance date for recipients with fifteen (15) or more employees" is extended "from May 11, 2026, to May 11, 2027" and "[t]he compliance date for recipients with fewer than fifteen (15) employees" is extended "from May 10, 2027, to May 10, 2028." *Id.* HHS also recognized that "further delays of this deadline" might occur and that it "plans to engage in future rulemaking related to the substantive requirements of the [HHS] Final Rule." *Id.* at 25501.

94. The HHS IFR was issued "without prior public notice and comment" and "without a delayed effective date." *Id.* at 25501. The HHS IFR provides for a "post-promulgation 60-day public comment period" but took immediate effect on May 11, 2026. *Id.* at 25502.

#### i.    *HHS Unlawfully Bypasses Public Comment*

95. HHS claims that it did "not have time to go through notice-and-comment rulemaking," as "circumstances outside of the Department's and recipients' control," *id.*, made the existing compliance deadlines "unlikely to be met by a significant number of recipients," *id*. at 25,498.

96. HHS relies on a handful of communications from those opposed to the HHS Final Rule that raise the same considerations weighed by HHS during the original rulemaking to justify its immediately effective IFR. That information was also available to HHS sufficiently in advance of May 11, 2026, to have allowed for pre-publication notice and comment. It includes the following:

97. **OMB Letters.** Like the DOJ IFR, the HHS IFR relies on comments submitted in response to the OMB's solicitation.

98. First, it cites a May 12, 2025, letter from Talkiatry, a telepsychiatry practice, that recommends rescission of several agency rulemakings, including the HHS Final Rule. *See* Letter from Georgia Gaveras, Co-Founder & Chief Med. Officer, & Robert Krayn, Co-Founder & Chief Exec. Officer, Talkiatry, to Russell Vought, Director, OMB 6 (May 12, 2025), https://perma.cc/4K4C-9T29 ("Talkiatry Letter") (cited in 91 Fed. Reg. 25498 n.28). Nowhere does the letter state that telehealth providers will be unable to meet the HHS Final Rule's compliance deadlines. While it claims that "many medical providers will be adversely affected," *id.*, it provides no support for that sweeping claim. And to the extent it expresses discontent about "implementation costs" and "[b]urdensome requirements," *id.* at 6-7, compliance costs were weighed by HHS in promulgating the HHS Final Rule, *see, e.g.*, 89 Fed. Reg. at 40176-77.

99. Second, the HHS IFR cites the same Associations Letter and SBA Letter discussed in the DOJ IFR, though it incorrectly represents that these letters were "comment[s] on DOJ's 2024 final rule," rather than letters to OMB in support of deregulation. 91 Fed. Reg. at 25498; *see supra* ¶¶ 76-77. Notably, neither of those letters even addresses the HHS Final Rule, and for the same reasons as *supra* ¶¶ 76-78, they provide no new information nor establish that entities are unable to comply with WCAG 2.1 standards. Indeed, the language HHS quotes from the Associations Letter expressly recognized that its members intend to comply but were seeking clarity as to whether they will need to do so under the Trump Administration, "[g]iven the shifts in administration priorities," 91 Fed. Reg. at 25498 (quoting Associations Letter at 2).

100. Third, the HHS IFR cites two letters submitted to OMB's Office of Information and Regulatory Affairs ("OIRA") on March 4, 2026, in connection with a meeting discussing the DOJ

27

Final Rule. *See id.* at 25499. Neither of these letters discusses the HHS Final Rule, and neither is cited in the DOJ IFR.

101. One of the letters, from the National Association of Counties ("NACo"), discusses its survey of counties finding that many faced obstacles to compliance, including "time-consuming and costly remediation of PDF documents," and difficulties associated with ensuring compliance by third-party contractors. 91 Fed. Reg. at 25499 (citing Letter from NACo, to OIRA (March 4, 2026), https://perma.cc/P3DW-ZDC4). Notably, the survey on which NACo—and thus HHS— relied, included responses from a mere 18 counties of the over 3,000 counties that NACo represents. Fed. Reg. at 25498; NACo Letter at 1. And NACo conceded that, while "costs . . . exceed[ed] what counties had budgeted for web content remediation," "DOJ's assessment of costs" in the 2024 DOJ FRIA "was either accurate or overestimated costs." *Id.* at 25498-99 (citing NACo Letter at 2). Finally, the alleged challenges that NACo discussed were of the sort considered by HHS during the 2024 rulemaking. *See, e.g.*, 89 Fed. Reg. at 40177 (remediation costs); *id.* at 40143-44, 40148 (third-party contractors).

102. The other letter, from the National League of Cities ("NLC"), was cited by HHS to support its concerns about the financial and time costs of website remediation. 91 Fed. Reg. at 25499 (citing Letter from Angelina Panettieri, Legis. Dir., NLC, to OIRA (March 4, 2026), https://perma.cc/32L3-AEYN). But NLC's concerns, including "limited staff support" and the costs of third-party remediation vendors, were raised in its own comment letter and considered during the original rulemaking. *See* NLC, *Comments on Nondiscrimination on the Basis of Disability: Accessibility of Web Information and Services of State and Local Government Entitie*s, RIN 1190-AA79 (Oct. 3, 2023), https://perma.cc/D8GZ-BDZW.

103. **DOGE Letter.** HHS also references a publicly unavailable, undated, and anonymous

28

response to the Department of Government Efficiency's request for "deregulatory suggestions." 91 Fed. Reg. at 25498. That anonymous commentator purportedly shared that the HHS Final Rule burdens "innovative startups," disadvantages those who "offer services to government funded programs," and disincentivizes companies from offering "new technology or services" to Medicare and Medicaid participants. *Id*. Nothing in HHS's summary of this communication speaks to whether recipients can comply with the HHS Final Rule's deadlines.

104. **HHS Communications.** HHS also relied on March 30, 2026 comments it received from a representative of primary healthcare associations that support federally qualified health centers ("FQHCs").[5] 91 Fed. Reg. at 25499. HHS has not made those comments publicly available. *Id.* at 25499 n.50. According to the HHS IFR, those comments stated that "there is a wide range of understanding of, and ability to comply with, the WCAG 2.1 success criteria among FQHCs, depending on their size, staff expertise, and operations," including a need to rely on outside vendors to ensure compliance. *Id.* at 25499. Once again, these sorts of compliance concerns were considered and discussed in the HHS Final Rule. *See supra* ¶¶ 99, 102, 103.

105. Relying on the anecdotal reports of compliance difficulties in these various letters, HHS broadly assumed that immediate relief is needed because not only will "a significant portion" of "FQHCs, cities, and counties" be unable to comply with the HHS Final Rule, but also "many other small and medium sized recipients." 91 Fed. Reg. at 25499.

    ii.   *HHS Arbitrarily and Capriciously Delays Implementation of the HHS Final Rule*

106. HHS's flimsy explanations for the HHS IFR do not withstand even the most basic scrutiny. The decision to extend the deadlines in a long-expected and thoroughly considered rule

---

[5] FQHCs are entities that serve certain medically underserved populations and meet certain statutory requirements. *See* 42 U.S.C. §§ 1396d(l)(2), 254b.

was based on anectodical reports—such as a survey of just 18 counties—and concerns about compliance with a *separate* rule, *see supra* ¶¶ 100-103. The harsh rhetoric, *see, e.g.*, Talkiatry Letter at 6 (suggesting that the HHS Final Rule "wastes a psychiatrist's time for important things like patient care"), unidentified speakers, *see supra* ¶¶ 104-105, and fact that many of the letters were submitted in response to requests for deregulatory ideas, further casts doubt on their reliability for assessing the feasibility of compliance with the HHS IFR. Indeed, HHS even credited one letter's account while acknowledging that other of its assertions were unreasonable; HHS relied on the Talkiatry Letter that referred to the HHS Final Rule as lacking "any material benefits," Talkiatry Letter at 6, despite pushing back on that claim, 91 Fed. Reg. at 25498 n.30.

107. HHS's willingness to rely on these accounts is particularly unreasonable given that, as it admits, it did not consider comments from members of the disability community or disability-rights organizations, *see id.* at 25500. HHS gives minimal weight to the harms the HHS IFR imposes on people with disabilities, conceding only that "delaying compliance dates . . . *may* lead to a corresponding delay in increased access for people with disabilities" and, "assum[ing] that there *may be some reliance* interests," the delay "*may* negatively impact those interests." *Id.* (emphases added). Without discussing in any detail what those negative impacts might be— including the ability of people with disabilities to access medical care, education, and social services—HHS asserted that "the benefits of this IFR outweigh the reliance interests," *id. See also infra* § VII (discussing impacts for NFB members).

108. HHS's claim that, in the interim, it can "expect[]" that covered colleges or universities will make course materials accessible if a student with disabilities is enrolled in the class, is belied by the HHS Final Rule's recognition that "postsecondary institutions do not [always] make their courses accessible or do not provide accessible materials in a timely manner." 89 Fed. Reg. at 40146. The HHS Final Rule includes multiple examples of this, including an instance of a law

school student whose classes were largely inaccessible, such as one class in which it "took six to eight weeks" to receive accessible course materials, and the student was required to cover half the costs. *Id.* at 40146. Like in the DOJ context, HHS's assertion that state agencies responsible for enrolling people in public-benefits programs will simply make reasonable modifications for people with disabilities conflicts with findings in the DOJ Final Rule, which the HHS Final Rule adopts as well. *See* 91 Fed. Reg. at 25500; 89 Fed. Reg. at 40130; *supra* ¶ 90.

109. The HHS IFR's other justifications fall into the same pitfalls as the DOJ IFR. For example, it recognizes that recipients may be generating web content using potentially inaccessible AI, claiming that increases their litigation risk. 91 Fed. Reg. at 25500. For that claim they cite the same sources as DOJ (a New York City Bar article and Northeastern University website)—which actually demonstrate why accessibility standards are needed. *See id.* at 25500 n.54; *supra* ¶ 82. HHS also makes no claims about the costs to recipients of ensuring that AI material is compliant to avoid that litigation risk, which the DOJ Final Rule determined was low, *see supra* ¶ 82.

110. The HHS IFR also references the HHS Final Rule's removal of an exception for certain educational content that was proposed in the HHS NPRM, claiming that more time will guard against hypothetical confusion and afford an opportunity for comment. *See* 91 Fed. Reg. at 25500. But as in the DOJ IFR, there is no basis to believe that the exclusion of that exception has caused confusion, and it was already the subject and result of public comment and reasoned consideration by HHS following the HHS NPRM. *See id.* at 25500; 89 Fed. Reg. at 40145-51; *supra* ¶ 83.

111. HHS further attempts to justify the IFR by arguing that the HHS Final Rule only intended for fundamental alteration and undue burden defenses to apply in "rare situations," but "widespread invocation of the . . . defenses . . . is likely" given compliance burdens. 91 Fed. Reg. at 25500. HHS claims that recipients would thus need to "engage in litigation," as well as "devote

31

significant amounts of time and money to" assessing and documenting whether a defense applies to their circumstances in responding to an HHS investigation or lawsuit. *Id.* at 25500-01. HHS claims that these costs were not "fully considered" in the 2024 HHS FRIA. *Id.* And, HHS posits, widespread reliance on these defenses "would lead to a situation where an unspecified number of recipients do not conform with the" WCAG 2.1, and "at least for some period of time, do not know the extent to which they are required to conform." *Id.*

112. As in the DOJ IFR context, these arguments lack coherency. A recipient would need to determine *before* the compliance deadline—and certainly long before any potential litigation— whether a defense exempts them from having to undertake compliance efforts. For larger recipients, that assessment has likely already occurred, given the HHS IFR was released on the same day as the HHS Final Rule's compliance deadline. It is also unclear how a delayed compliance date would ameliorate litigation risk, recipient non-conformance, or uncertainty about compliance obligations, because recipients who believe they qualify for a defense will not undertake compliance efforts and thus face the same uncertainty and litigation risk once the HHS Final Rule takes effect. HHS considered none of this. Instead, it relied on an unsupported claim that assessing defenses would take "significant amounts of time and money," *id.* at 25500.

113. The HHS IFR does not include a FRIA. Rather, it references the 2024 HHS FRIA, asserting that "[b]y pushing out implementation by one year, this IFR would eliminate both costs and benefits in the first year that were estimated in the [2024 HHS] [F]RIA while adding another year of costs and benefits in the future." *Id.* at 25503. In doing so, the HHS IFR fails to account for the fact that many recipients have already expended significant costs in reliance on the HHS Final Rule's compliance deadlines.

114. The HHS IFR's own discussion of costs and benefits also undermines the rationality of

its policy: the estimated "cost savings . . . are lower than the foregone benefits estimated" and the "IFR would result in a net decrease in benefits." *Id.* at 25505. HHS attempts to explain this away by referencing "unquantifiable or difficult to quantify" cost savings, providing the singular example of "avoiding making the fact dependent determination of whether a recipient may invoke a defense of fundamental alteration or undue burden." *Id.* But there is strong reason to believe that the costs of assessing a defense would be incurred regardless of the IFR, *see supra* ¶ 112, and HHS provides no basis for concluding that those costs could explain a $633 to $823 million net decrease in benefits, 91 Fed. Reg. at 25505.

115. Finally, like the DOJ IFR, the HHS IFR recognizes that it serves the Trump Administration's deregulatory agenda. *Id.* at 25505-06.

**VII.    Impact of the IFRs on NFB, Its Employees, and Its Members**

116. The NFB's mission is to promote the general welfare of the blind by supporting their efforts to integrate themselves into society on terms of equality and by redressing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life—including in education, employment, family and community life, transportation, healthcare, and recreation.

117. As part of its mission, the NFB and many of its members and affiliates have been actively involved in promoting accessible technology for the blind. The NFB pursues litigation and policy advocacy, and it provides counseling and referrals, training, evaluation, resources, and information regarding access technology and accessible websites and mobile apps. In doing so, the NFB also employs many blind people on its staff.

118. For example, the NFB regularly comments on proposed regulations relevant to the blind community. It also provides a host of services and resources, including training, best practices, and beta testing, to improve blind people's access to information and services of state and local

governments, businesses, employers, and other entities.[6] It assists blind students, their parents, and professors in navigating accessibility barriers in education.[7] The NFB and its members and affiliates also actively promote accessible technology and digital information in the healthcare and health services context, including by providing accessible public health information and resources during the COVID-19 pandemic.[8]

119. The NFB and its affiliates are also active in assisting members in navigating public benefits and social service systems. For example, the NFB's staff provides blind parents mentoring assistance, and assists and advocates for blind parents when their rights are challenged in hospitals, child welfare, foster care, and adoption systems.

120. NFB's blind members frequently use access technology, such as screen reader software, to access the websites and mobile apps of state and local government entities, healthcare entities, and social service and benefits providers in their daily lives. When websites and apps are not accessible, it is difficult or impossible for the NFB's blind members to use them.

121. The same is true for the NFB's blind employees and affiliate volunteers, who, using access technology, seek to access similar content in doing the work of the organization and helping the NFB's members. When websites and apps are not accessible, it undermines their ability to do their work.

---

[6] *See, e.g.*, NFB, *Center of Excellence in Nonvisual Accessibility*, https://perma.cc/U377-USDQ; NFB, *International Braille and Technology Center for the Blind*, https://perma.cc/GT5H-FM96; NFB, *National Center for Nonvisual Election Technology*, https://perma.cc/74JK-VKGH; NFB, *Voting Resources*, https://perma.cc/7LUQ-XRNK; NFB, *Self-Advocacy Toolkit and Tracking Form for Nonvisual Accessibility*, https://perma.cc/TSU5-DRSV.

[7] *See, e.g.*, NFB, *Students*, https://perma.cc/FK56-S4NX; NFB, *Higher Education Accessibility Online Resource Center*, https://perma.cc/6JB8-6MWQ; NFB, *Education Technology Survey*, https://perma.cc/86H2-UBQ2; NFB, *Self-Advocacy in Higher Education Toolkit*, https://perma.cc/J9U9-HZRW; NFB, *A Blind Parent's Essential Guide to Effective Communication from Public and Private Schools*, https://perma.cc/J7U3-JLNU; NFB, *Accessibility Inclusion Fellowship*, https://perma.cc/2N6D-G4JS.

[8] *See, e.g.*, NFB, *Medical Device Nonvisual Accessibility Act*, https://perma.cc/769Y-JKK5; NFB, *COVID-19 Resources*, https://perma.cc/S7FP-J9WJ.

122. For example, Andrew Slater is a blind NFB member residing in Illinois who attempted to use the Illinois unemployment services website to apply for unemployment benefits. The website was not designed for screen readers, making it difficult to navigate. Certain fillable online forms could not be completed, making it impossible for him to submit his application for benefits online. Andrew spent hours attempting to resolve the issue via phone calls directly to the relevant administrative agency, and the agents he spoke with frequently recommended actions that were similarly inaccessible for a blind screen reader user of the website. These barriers resulted in inconvenience and wasted time that a sighted person does not have to endure.

123. Sina Bahram is a blind NFB member residing in North Carolina. He is an accessibility consultant, computer scientist, and entrepreneur who works with organizations to embed accessibility and inclusion into their work. Sina frequently encounters inaccessible digital content on government websites and apps, which imposes barriers to his work that sighted service providers and entrepreneurs do not experience. For example, Sina recently needed to form a new corporate entity in North Carolina, but the state web portal was inaccessible by screen reader. He instead had to pay a registered agent to form the entity on his behalf, imposing additional cost, delay, and inconvenience.

124. Margie Donovan is a blind NFB member residing in California, interested in attending local city events and engaging with the activities of the Parks and Recreation Department. Over her 15 years of residency, the city's websites have never been accessible to her screen reader, preventing her from accessing the calendar of events and other information about available programming. She has raised her concerns with the city's administrators to no avail.

125. Dana Ard, a blind resident of Idaho and President of the NFB affiliate of Idaho, has faced exclusion from the democratic process due to inaccessible digital information. On several

35

occasions, in service of her responsibilities with the NFB, Dana has sought to identify state legislators on relevant legislative committees, among other information on Idaho state government websites. However, because the websites were inaccessible to her screen reader, Dana has been unable to find the information she needed to participate.

126. Lindsey is a blind NFB member residing in California. She is a graduate-level student at a public university, a public entity covered by Title II. She faced delays enrolling in her graduate coursework because her university circulated the course catalog in a table within a PDF. The table and the PDF were not accessible to her screen reader, which made it impossible for her to review the available courses with the same convenience and timeliness as her sighted classmates.

127. Jolean O'Connell is a blind NFB member residing in Kentucky. She recently sought health services from a therapist who offers telehealth appointments. However, when Jolean reported that the signature box on the online intake form was inaccessible by screen reader and suggested an alternative signature method, the therapist declined to provide her services. As a result, the therapist told Jolean that telehealth services were not appropriate for her.

128. Chris Danielsen is a blind NFB member and employee residing in Maryland. He received a text message notice that payment was due to LabCorp for medical tests. The hyperlink in the text message led to an inaccessible payment form, in which it was impossible to enter credit card information via screen reader. Chris used his cell phone to call customer service and attempted to enter payment information by phone. That required multiple, unsuccessful attempts because the automated agent required Chris to enter information provided in the payment form, and timed out before Chris could do so. After around 30 to 45 minutes, Chris was able to pay the medical bill via landline telephone with a tactile keypad. Had LabCorp's payment portal been accessible, the same task would have taken Chris about two to five minutes to complete.

129. Under the IFRs, these individuals and many other NFB members, staff, and affiliates will

36

continue to face barriers to accessing public benefits and services, working and running their businesses, obtaining healthcare, participating in their education, and civically engaging.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE APA, 5 U.S.C.§ 706(2)(D) – FAILURE TO OBSERVE REQUIRED PROCEDURE (AGAINST ALL DEFENDANTS)

130.  The paragraphs above are incorporated and reasserted as if fully set forth here.

131. A reviewing court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

132. The APA requires that agencies follow public notice-and-comment rulemaking procedures before promulgating regulations. *See id.* § 553(b), (c). DOJ and HHS failed to provide notice and an opportunity for public comment on the IFRs in any manner prior to their issuance.

133. The APA's good-cause exception to notice and comment where it is "impracticable, unnecessary, or contrary to the public interest," *id.* § 553(b)(B), is inapplicable to the IFRs.

134. The APA's exception to notice and comment for "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts," *id.* § 553(a)(2), is inapplicable to the HHS IFR because HHS has, as a matter of policy, waived applicability of that exception, *see Public Participation in Rule Making: Statement of Policy*, 36 Fed. Reg. 2532 (Feb. 5, 1971), and its attempt to rescind that policy is arbitrary and capricious, *see Policy on Adhering to the Text of the Administrative Procedure Act*, 90 Fed. Reg. 11029 (Mar. 3, 2025).

135. Because the IFRs became immediately effective and contain only a 60-day post-publication comment period, Defendants will not be able to consider comments opposing the IFRs prior to their implementation, including comments explaining the costs and burdens specifically associated with extending the Final Rules' deadlines two years after they were originally imposed.

136. Had the IFRs been the subject of advance publication and notice-and-comment

37

rulemaking under the APA, DOJ and HHS could have considered comments from Plaintiff, its members, and the broader public opposing the IFRs' adoption.

**COUNT II**
**VIOLATION OF THE APA, 5 U.S.C.§ 706(2)(A) – ARBITRARY & CAPRICIOUS**
**(AGAINST DEFENDANTS DOJ AND ACTING ATTORNEY GENERAL BLANCHE)**

137. The paragraphs above are incorporated and reasserted as if fully set forth here.

138. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

139. The DOJ IFR is arbitrary and capricious because Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

140. For example, and as described *supra* ¶¶ 80-92, DOJ failed to meaningfully consider the harmful impacts on people with disabilities of extending the compliance dates. It also failed to meaningfully consider the costs and benefits of the DOJ IFR, and whether the extension would remedy the alleged problem when the DOJ Final Rule's deadline for larger government entities was just days away and compliance efforts would thus be nearly complete.

141. Moreover, many of the justifications for the DOJ IFR are wholly implausible. For example, while DOJ claimed that it relied on new information, the same information was available to DOJ at the time of the DOJ Final Rule, and the letters cited were available many months before the DOJ IFR's publication. DOJ's claim that the extension will promote accessibility lacks any evidentiary basis, as does its concern about supposed foreign actors who might sue non-complying governments under the DOJ Final Rule. The DOJ IFR's characterization of the DOJ Final Rule's

38

incorporation of the WCAG 2.1 standard is also inaccurate, and its discussion of AI only serves to demonstrate why the DOJ Final Rule's accessibility standards are increasingly necessary.

142. DOJ also failed to consider reasonable alternatives. For example, it did not consider limiting its extension only to those entities who are actually unable to comply with the DOJ Final Rule's deadlines due to administrative or financial barriers. It also did not consider providing a pre-publication notice and comment period as to the April 26, 2027 deadline for government entities with populations under 50,000 people and special district governments.

143. For these reasons, and many others, the DOJ IFR is arbitrary and capricious.

**COUNT III**
**VIOLATION OF THE APA, 5 U.S.C.§ 706(2)(A) – ARBITRARY & CAPRICIOUS**
**(AGAINST DEFENDANTS HHS AND SECRETARY KENNEDY)**

144. The paragraphs above are incorporated and reasserted as if fully set forth here.

145. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

146. The HHS IFR is arbitrary and capricious because HHS "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc.*, 463 U.S. at 43.

147. For example, and as described *supra* ¶¶ 106-115, HHS based its sweeping conclusions regarding harms on a limited set of anecdotal accounts, many of which lacked indicia of reliability and did not even the address the HHS Final Rule. HHS also failed to meaningfully consider the harmful impact on people with disabilities of extending the compliance dates. It also relied on flawed economic assumptions and findings that demonstrate that the HHS IFR would actually reduce net benefits. HHS failed to consider whether the extension would remedy the alleged problem given the HHS IFR was released on the same day as the HHS Final Rule's deadline for

39

larger recipients, and thus compliance efforts would have already been undertaken.

148. Many of the justifications for the HHS IFR are wholly implausible. Its discussion of AI serves only to demonstrate why the HHS Final Rule's accessibility standards are increasingly necessary. And its concerns about litigation risk would not be mitigated by the HHS IFR.

149. HHS also failed to consider reasonable alternatives. For example, it did not consider limiting its extension only to those recipients who are actually unable to comply with the HHS Final Rule's deadlines due to administrative or financial barriers or only to smaller recipients. It also did not consider providing a pre-publication notice and comment period as to the May 10, 2027, deadline for recipients with fewer than fifteen employees.

150. For these reasons, and many others, the HHS IFR is arbitrary and capricious

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court:

a. Hold unlawful, vacate, and/or set aside the IFRs under 5 U.S.C. § 706;

b. Declare that the IFRs are unlawful under the APA;

c. Award Plaintiff its attorney's fees and costs for this action;

d. Award such other and further relief as the Court deems just and proper.


Date: May 21, 2026                                    Respectfully submitted,


                                                    /s/ *Paul Wolfson*
                                                    Laura Bakst*
                                                    Paul Wolfson (Bar No. 31856)
                                                    Robin Thurston (Bar No. 31584)
                                                    Democracy Forward Foundation
                                                    P.O. Box 34553
                                                    Washington, D.C. 20043
                                                    Main: 202-448-9090
                                                    lbakst@democracyforward.org

Eve L. Hill (Bar No. 19938)
Michael R. Abrams (Bar No. 30426)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
mabrams@browngold.com

*Counsel for Plaintiff*

*Pro Hac Vice Forthcoming

41